UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

      Plaintiff,                       CRIMINAL CASE NO. 09-20618

     v.                              DISTRICT JUDGE VICTORIA A. ROBERTS

BRANDON HENRY DAVIS-DEVINE,     MAGISTRATE JUDGE MARK A. RANDON

      Defendants.
_____/

# REPORT AND RECOMMENDATION TO GRANT
# DEFENDANT'S MOTION TO SUPPRESS (DKT. 12)

## I. PROCEDURAL HISTORY

Defendant, Brandon Henry Davis-Devine ("Defendant"), was indicted on December 17, 2009, on charges of counterfeiting and possession of counterfeit money (Dkt. 7). On February 16, 2010, Defendant filed a motion to suppress evidence seized by Romulus police officers during a search of Defendant's hotel room conducted on November 19, 2009 (Dkt. 12). Defendant alleged that the officers illegally searched his room without first obtaining a search warrant and absent exigent circumstances justifying a warrantless search.

On February 17, 2009, the Court referred Defendant's motion to the undersigned for a Report and Recommendation (Dkt. 13). The Government responded to Defendant's motion on March 2, 2010 (Dkt. 15), arguing that "there is absolutely no evidence that the officers entered the motel room prior to obtaining a search warrant" (Dkt. 15, page 1). Defendant filed a reply on March 8, 2010 (Dkt. 17).

-1-

An evidentiary hearing was conducted on March 18, 2010. Seven witnesses testified at the evidentiary hearing. The Government called three Romulus police officers – Corporal Alan Hays, Officer Matthew Reese and Officer Adrian Peters. Defendant called three witnesses – Brandon Ashby (a guest in Defendant's hotel room), Jenna Newman (another guest in Defendant's hotel room) and Clara Peterson (Defendant's grandmother). Defendant also testified. The testimony of the seven witnesses was largely consistent in certain relevant aspects. Most significantly, every witness present during Defendant's arrest testified at the hearing that the officers entered Defendant's hotel room **prior to** obtaining a search warrant.

Just before the evidentiary hearing and then in its post-hearing supplementary brief (Dkt. 18), the Government changed its position from its original claim that the officers never entered Defendant's hotel room prior to obtaining a search warrant. Instead, the Government now argues that the officers were justified in entering Defendant's hotel room without a warrant – due to exigent circumstances – following a lawful investigatory stop of Defendant and "protective" search of the area around Defendant. Defendant also filed a post-hearing brief, on March 31, 2010 (Dkt. 19).

For the reasons set forth below, it is **RECOMMENDED** that Defendant's motion to suppress be **GRANTED**, and that the evidence obtained during the search of Defendant's hotel room be suppressed.

## II. FACTUAL FINDINGS

In the early morning hours of November 19, 2009, Romulus police officers were summoned to a local gas station after receiving a report that a patron tried to pass a counterfeit $20 bill to the cashier. Corporal Jones arrived at the gas station, arrested the patron – later

identified as Josh Ianni – and then interviewed him. During this interview, Mr. Ianni stated that he received the counterfeit $20 from an individual know as "Jay," who Mr. Ianni last saw at the Metro Inn in room 241. Mr. Ianni described "Jay" as a "5'7" white male, cocky, 5 o'clock shadow, with a spider web tattoo on his left hand (Dkt. 18, Ex. B, Statement of J. Ianni).

After arresting and interviewing Mr. Ianni, Corporal Jones contacted Corporal Hayes and directed him to investigate room 241 at the Metro Inn (Dkt. 20, Hearing Transcript "Tr." at 12). Corporal Hays testified during the evidentiary hearing that he did not receive or request from Corporal Jones a detailed description of the person allegedly distributing counterfeit money; rather, Corporal Hays claimed that he only learned that the suspect was male and was believed to be staying in room 241 of the Metro Inn (Tr. 36-37). Corporal Hayes also neither received nor sought any information as to when the suspect was last known to be staying in room 241 and made no inquiry as to whether the suspect may be armed or dangerous.

Corporal Hayes requested an additional unit accompany him to the hotel – Officers Reese and Peters were the additional unit (Tr. 13). All three officers arrived at the Metro Inn at approximately 3:40 a.m., in full police uniform and riding in patrol cars (Tr. 11, 13). Upon arriving at the Metro Inn, Corporal Hays and Officers Reese and Peters proceeded up to the second floor and began walking towards room 241. *Id.* Before proceeding to the room, the officers did not obtain any information from the staff at the Metro Inn regarding who was occupying room 241 or when the room was last rented.

While walking towards room 241, Corporal Hays observed a woman – later identified as Jenna Newman – exit from room 241 into the hallway (Tr. 14). Corporal Hays asked Ms. Newman where she just came from, to which Ms. Newman responded "room 242." *Id*. Corporal

Hays testified that he believed Ms. Newman was being untruthful, as room 242 was on the opposite side of the hallway and as Corporal Hays saw Ms. Newman actually exit from room 241. *Id.* Corporal Hays resumed walking towards room 241 when a teenaged girl – later identified as Chelsey Bolton – also exited from room 241 into the hallway (Tr. 39). Corporal Hays asked Ms. Bolton if there was anyone else in room 241, to which Ms. Bolton responded "no" (Tr. 14-15). Neither Ms. Newman nor Ms. Bolton was frisked for weapons, and Officer Reese testified that he was "completely calm" and not at all nervous as he approached the room (Tr. 91-92).

Corporal Hays then continued walking towards the door of room 241, and was about to knock on the door, when the door opened and Defendant (a 6' 2" black male) began to exit the room. *Id.* Corporal Hays observed that Defendant had a blue canvas Detroit Pistons bag on his shoulder and that, when Defendant saw Corporal Hays, Defendant dropped the blue bag to the ground, turned around, and walked further back into the room away from the officers (Tr. 15, 42; Corp. Hays Supp. Report, Dkt. 15, Ex. A). Officer Reese was standing directly behind Corporal Hays at this point, and also testified that Defendant dropped a blue bag upon seeing both officers (Tr. 69). Both Corporal Hays and Officer Reese testified that the bag made a loud "thud" when it hit the ground (Tr. 16, 69). Both Corporal Hays and Officer Reese testified that the bag fell *inside* the hotel room, not outside the room in the hallway (Tr. 42, 87).

Corporal Hays then stepped into the hotel room, prevented the hotel door from closing with his foot (Tr. 54) and began questioning Defendant. Corporal Hays also testified that he saw another individual – later identified as Brandon Ashby – lying on one of the hotel beds (Tr. 17). At approximately the same time as Corporal Hays began questioning Defendant, Officer Reese

either walked into the room (Tr. 43) or reached across the threshold of the room (Tr. 84) and picked up the blue bag (which was cinched shut with a draw string) and immediately opened the bag "to see if there's any weapons or anything inside the bag" (Tr. 71). Upon opening the bag, Officer Reese discovered an envelope, containing multiple sheets of computer printer paper with images of $20 bills printed on them. *Id.* Officer Reese informed Corporal Hays of what he discovered in the bag, at which point Corporal Hays placed Defendant under arrest (Tr. 22). Upon placing Defendant under arrest, Corporal Hays searched Defendant, and removed a large bundle of cash from Defendant's left front pocket, which appeared to be multiple counterfeit $20 bills, as the bills all displayed identical serial numbers (Tr. 24).

Corporal Hays further testified that, after arresting Defendant, he was then able to see further into the room and that he observed a gray tote with a computer printer sitting inside it, along with a stack of printer paper on a desk in the corner of the room (Tr. 19, 20). At this point, Corporal Hays detained and handcuffed Mr. Ashby, who had been asleep on the hotel bed until Corporal Hays woke him up (Tr. 24, 138). Corporal Hays then conducted a quick visual sweep of the room, looking for weapons or anyone else hiding in the room or the bathroom (Tr. 26). Corporal Hays did not locate any weapons during this visual search, nor did he find anyone else in the hotel room.

Once the room was secured, Corporal Hays contacted his shift supervisor, Sergeant Shelby, who instructed Corporal Hays to contact the detective bureau for further directions (Tr. 28). While on the telephone with Detective Landry of the detective bureau, Corporal Hays asked Defendant to sign a consent form to permit a search of room 241 (Tr. 30, 31). Defendant refused

to consent to any search (Tr. 31, 56). At that point, Detective Landry told Corporal Hays that he would prepare a search warrant (Tr. 31; Search Warrant, Dkt. 15, Ex. 2).

### III. ANALYSIS

In *Terry v. Ohio*, 392 U.S. 1 (1968), the Supreme Court determined that it was proper, under the Fourth Amendment, for a police officer to stop and question individuals where the officer had a reasonable suspicion that the individuals were engaged in or about to be engaged in criminal activity. The Court generally described such police conduct as "necessarily swift action predicated upon the on-the-spot observations of the officer on the beat." *Id*. at 20. This determination came with a standard that required the police officer to have "specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant" stopping the suspect and making an inquiry. *Id*. at 21. The standard was also deemed to be an objective one such that the facts would have to warrant a person of "reasonable caution" to believe that the action was necessary. *Id*. "Anything less would invite intrusions upon constitutionally guaranteed rights based on nothing more substantial than inarticulate hunches, a result [the Supreme Court] has consistently refused to sanction." *Id*. at 22.

These type of encounters by the police and individuals have come to be known as investigatory stops or *Terry* stops. Courts reviewing the propriety of an investigatory stop must look at the totality of the circumstances to determine if the officer had a particularized and objective basis for suspecting criminal activity. Additionally, officers are allowed to rely on their training and experience to draw inferences and make deductions about the information available to them. *United States v. Arvizu*, 534 U.S. 266, 273 (2002).

*Terry* further permits an officer to conduct a "patdown" or "protective frisk" of an individual "upon reasonable suspicion that [he] is armed and dangerous." *Knowles v. Iowa* 525 U.S. 113, 117-18 (1998) (citing *Terry*, 392 U.S. at 27). The Supreme Court in *Terry* reasoned that:

> [o]ur evaluation of the proper balance that has to be struck in this type of case leads us to conclude that there must be a narrowly drawn authority to permit a reasonable search for weapons for the protection of the police officer, where he has reason to believe that he is dealing with an armed and dangerous individual, regardless of whether he has probable cause to arrest the individual for a crime. The officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger. And in determining whether the officer acted reasonably in such circumstances, due weight must be given, not to his inchoate and unparticularized suspicion or "hunch," but to the specific reasonable inferences which he is entitled to draw from the facts in light of his experience.

*Terry*, 392 U.S. at 27 (internal citations and footnotes omitted), *see also U.S. v. Paulino*, 935 F.2d 739, 746 (6th Cir. 1991).

The Supreme Court has also held that the protective search may extend to the area surrounding the individual during a *Terry* stop "if the police officer possesses a reasonable belief based on specific and articulable facts which, taken together with the rational inferences from those facts, reasonably warrant the officers in believing that the suspect is dangerous and the suspect may gain immediate control of weapons." *Michigan v. Long*, 463 U.S. 1032, 1049-50 (1983). A *Terry* protective search for weapons, however, is very different from a warrantless search incident to a lawful arrest:

> A *Terry* search, "unlike a search without a warrant incident to a lawful arrest, *is not justified by any need to prevent the disappearance or destruction of*

> *evidence of crime.... The sole justification of the search ... is the protection of police officers and others nearby ....*" 392 U.S. at 29. What we borrow now from *Chimel v. California*, 395 U.S. 752 (1969) and *Belton* is merely the recognition that part of the reason to allow area searches incident to an arrest is that the arrestee, who may not himself be armed, may be able to gain access to weapons to injure officers or others nearby, or otherwise to hinder legitimate police activity. This recognition applies as well in the *Terry* context. However, because the interest in collecting and preserving evidence is not present in the *Terry* context, we require that officers who conduct area searches during investigative detentions must do so only when they have the level of suspicion identified in *Terry*.

*Id.* at n. 14 (emphasis added).

The scope of a weapons search reflects a limited purpose – protection of the police and others nearby. *See Minnesota v. Dickerson*, 508 U.S. 366, 378 (1993). The protective frisk must be confined in scope to an intrusion reasonably designed to discover instruments which could be used to assault the officer. When a lawful search for weapons results in the seizure of a different item, the Supreme Court is "sensitive to the danger ... that officers will enlarge a specific authorization, furnished by a warrant or an exigency, into the equivalent of a general warrant to rummage and seize at will." *Dickerson*, 508 U.S. at 378 (quoting *Texas v. Brown*, 460 U.S. 730, 748 (1983) (Stevens, J., concurring in the judgment)). Where a protective search extends beyond what is necessary to determine if the suspect is armed, the search is no longer valid under *Terry*, and its fruits must be suppressed. *Dickerson*, 508 U.S. at 373 (citing *Sibron v. New York*, 392 U.S. 40, 65-66 (1968)).

In *Dickerson*, the Supreme Court held that law enforcement officers may seize contraband found during protective searches for weapons. *Dickerson*, 508 U.S. at 373. One important qualification accompanied the Supreme Court's expansion of the plain-view doctrine to encompass such "plain-touch" seizures – law enforcement must remain within the boundaries

set in *Terry* for protective searches. *Dickerson*, 508 U.S. at 372-74. The Court approved the Minnesota Supreme Court's conclusion that the officer conducting the protective frisk overstepped these boundaries by "squeezing, sliding and otherwise manipulating the contents of the defendant's pocket" even though he knew it contained no weapon. *Id.* at 378 (quotation omitted). A leading commentator has stated the rule of *Dickerson* more bluntly: "If during a lawful pat-down an officer feels an object which obviously is not a weapon, further 'patting' of it is not permissible." 4 Wayne R. LaFave, Search and Seizure § 9.6(a), at 660 (4th ed. 2004).

In the present case, Defendant claims that there was inadequate information to establish a reasonable suspicion that Defendant was, or was about to be, engaged in criminal activity. As such, Defendant argues that the Romulus police did not have the right to stop and question him at all. Defendant further argues that the officers lacked a reasonable belief that Defendant was possibly armed and dangerous at the time they made a search of his duffle bag. In sum, Defendant avers that the investigatory stop and frisk of Defendant was improper and any evidence obtained as a result was seized in violation of Defendant's Constitutional rights.

The Government contends that there was a reasonable suspicion for an investigatory stop of Defendant based on: (1) information officers received from Mr. Ianni that he obtained a counterfeit $20 bill from a man staying in room 241 of the Metro Inn; and (2) the officers' observation of two women exiting room 241, one of whom lied about which room she exited from and the other of whom lied about whether additional people were in the room. The Government further contends that, because the duffle bag dropped by Defendant made a loud "thud" when it hit the ground, it was reasonable for the officer to retrieve the bag – which was

laying within Defendant's reach – to make sure the duffle bag did not contain a weapon that could be used to harm the officers (Dkt. 18, pp. 4-5).

The propriety of the search of Defendant's bag is the linchpin upon which the subsequent actions of the officers depends. Should the search of Defendant's bag be deemed unlawful, no probable cause would exist to arrest Defendant and, thus, there would be no justification for the recovery of the counterfeit cash from Defendant's person nor for a further intrusion into the privacy of Defendant's hotel room. As discussed in more detail below, the undersigned finds that – while the *Terry* stop of Defendant was properly based on reasonable suspicion that Defendant may be engaged in criminal activity – the Romulus police lacked a reasonable belief that Defendant might be armed and dangerous. Therefore, the undersigned finds that the Romulus police had a right to stop and question Defendant, but did not have a right to seize Defendant's bag or to frisk Defendant. Further, the undersigned finds that – even assuming the Romulus police did have a reason to fear that Defendant was armed and dangerous – once Defendant's bag was in the control of the officers, the officers should have felt the thin canvas duffle bag, or at least questioned Defendant about the duffle bag's contents, before making a determination to open Defendant's bag.

### A. The *Terry* Stop Of Defendant Was Proper

As noted above, the Government argues that the Romulus police officers had reasonable suspicion to stop Defendant for further investigation based on the fact that they were told a man in room 241 supplied counterfeit currency to a person arrested for passing same at a local gas station and based on the untruthfulness of the females who left the room just prior to the officers'

arrival. Although a close call, the undersigned finds that the officers did have a reasonable suspicion to stop and question Defendant.

This determination is a close call given that Mr. Ianni's described the person distributing counterfeit money from room 241 as a white male "5'7", cocky, 5 o'clock shadow, with a spider web tattoo on his left hand" (Dkt. 18, Ex. B, Statement of J. Ianni). Defendant is black, and is 6'2" tall – clearly not the same suspect as described by Mr. Ianni. In addition, the officers made no preliminary effort to determine who had last rented the room from hotel staff (such that they were at best uncertain as to whether or not they were dealing with the counterfeiting suspect). However, officers did receive a report that *someone* staying in room 241 had distributed counterfeit monies. This fact, combined with the fact that the females exiting room 241 lied to the officers, and with the fact that people were milling about Defendant's hotel room at 3:45 in the morning is enough to justify the initial *Terry* stop of Defendant.

### B. The Search Of Defendant's Duffle Bag Was Improper

The analysis does not, however, end with a finding that the officers had the right to stop and question Defendant. The Court now turns to the conduct of the officers after they stopped Defendant. Indeed, the Sixth Circuit very recently recognized that "[p]ursuant to *Terry*, an investigatory stop and frisk is constitutionally permissible if two requirements are met. First, there must be a proper basis for the stop. This requirement is satisfied in the context of an on-the-street encounter when the officer has a reasonable suspicion that criminal activity 'may be afoot.' *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (internal quotation marks omitted). **Second, to proceed from a stop to a frisk, the police officer must have reasonable suspicion that the person stopped is armed and dangerous.** *Arizona v. Johnson*, ---U.S. ----, ----, 129

S.Ct. 781, 784 (2009)." *United States v. McDaniel*, 2010 WL 1253811 *3 (6th Cir., April 2, 2010) (emphasis added). Officer Reese testified that as soon as Defendant dropped the duffle bag, Officer Reese picked it up and immediately opened it. Officer Reese stated that he picked up and opened Defendant's duffle bag "to check to see if there was any weapons or anything in the bag" (Tr. 71). The question then becomes, was Officer Reese justified in "frisking" Defendant, that is to say, in seizing and in opening Defendant's duffle bag.

The Government relies primarily on two cases cited in its sur-reply brief in support of its argument that Officer Reese lawfully seized and opened Defendant's duffle bag – *United States v. Johnson*, 637 F.2d 532 (8th Cir. 1980) and *United States v. Garcia*, 909 F.2d 389 (9th Cir. 1990) (Dkt. 18, pp. 3-4). Both cases are readily distinguishable from the present case. In *Johnson*, the officers were called to investigate an individual acting suspiciously at a gas station. Indeed, initial the call to the police indicated that the manager was fearful that an armed robbery was about to take place. The suspicious individual, the defendant, was loitering around the gas station with a hooded jacket secured tightly around his head, so that only his eyes and nose were visible. *Id*. at 533. The defendant was carrying a green waterproof type duffel bag, tied closed at the top, except for a cloth covered object protruding about four of five inches from the bag. *Id.* The defendant was making simulated telephone calls from a pay telephone inside the station – the calls appeared to the store manager to be simulated, because the defendant only inserted a nickle (not enough to make a call) into the payphone and because during one of the defendant's "calls" the phone rang with an incoming call for the manager. *Id*. Additionally, the defendant wore gloves while making telephone "calls," despite the fact that it was quite warm inside the station. *Id.*

When two police officers arrived on scene, they approached the defendant and began questioning him. One officer conducted a "pat-down" search of the defendant, while the other officer began examining the green bag sitting on the floor next to the payphone. Concerning the bag, the officer removed the loose cloth covering the protruding object, and found the protrusion to be the wooden stock of a weapon. *Id.* at 533-534. The officer then removed the weapon from the bag, stating that "[t]he amount that I had felt and I had observed when I grabbed the bag and grabbed the stock of the gun, led me to believe that what I had was, in fact, an illegal weapon, either a sawed-off shotgun or a sawed-off rifle." *Id.* at footnote 3.

The *Johnson* case is distinguishable from the present case in the following significant ways. In *Johnson*, police were called to investigate a possible armed robbery – *i.e.* a crime involving weapons. In the present case, officers were dispatched to investigate the production/distribution of counterfeit $20 bills. At no time were the Romulus officers instructed to be on the lookout for an armed or dangerous subject. Indeed, there is no evidence in this case that the officers believed Defendant to be armed and dangerous. As such, the officers had no justification to conduct a pat-down frisk of Defendant nor the area surrounding Defendant. *See, e.g.*, *United States v. Humphrey*, 2007 WL 1341356 *5 (W.D. Tenn., May 4, 2007).

Furthermore, in *Johnson*, the wooden stock of a weapon was protruding "four or five inches" from the duffle bag, and the officers could feel that the weapon was, in their estimation, an illegally sawed-off firearm. In the present case, the blue duffle bag was cinched closed with nothing protruding from it. Furthermore, Officer Reese did not testify that felt anything through the bag that seemed like a weapon, much less an illegally modified weapon. Rather, Officer

-13-

Reese immediately opened the blue duffle bag upon picking it up from the ground and did not attempt to ascertain what was in the blue duffle by palpating or feeling the bag before opening it.

Indeed, the *Johnson* case, cited by the Government in its sur-reply brief, actually recognizes that "absent exigent circumstances, the search of an unlocked tote bag without a warrant violated the Fourth Amendment. Exigent circumstances did not exist because at the time the bag was searched it was clearly within the exclusive control of the officer and there was no longer any danger that the arrestee might gain access to the bag to destroy evidence or grab a weapon." *Johnson*, 637 F.2d at 535. This hypothetical discussed in *Johnson* is exactly what occurred in the present case – at the time the bag was opened and searched, it was in the exclusive control of Officer Reese and there was no longer any danger that Defendant might gain access to the bag and grab a weapon. Accordingly, exigent circumstances did not exist for Officer Reese to open the bag after retrieving it from the floor. *See also, United States v. Vaughan*, 718 F.2d 332, 335 (9th Cir. 1983) (Agents "could have felt the briefcase without opening it to see if any weapons were in it and that the opening of the case to search further was not justified.").

The *Garcia* case is likewise distinguishable from the present case. In *Garcia*, officers observed a motorcyclist weaving in and out of traffic at speeds between 80 to 90 miles per hour. *Garcia*, 909 F.2d at 390. After leading officers on a dangerous high speed pursuit, the defendant eventually pulled over and dismounted his motorcycle. *Id.* The defendant then removed a "fanny pack" from around his waist, set it on the gas tank of his motorcycle and opened the fanny pack to retrieve his driver's license and registration. *Id.* The defendant left the fanny pack open. *Id.* An officer the patted down the defendant for weapons, but found none. *Id.* At this point,

another officer peered into the open fanny pack and observed a white colored bag in the fanny pack with the letters "B of A" written on it. *Id.* This officer then "checked the fanny pack for possible weapons by putting his hand on the part of the pack containing the bag and feeling it." *Id.* The officer then asked the defendant what was in the bag, and the officer stated "feels like a lot of money." *Id.* At this point, the defendant stated loudly to the officer "Get your hands off there" and bolted into a nearby field. *Id.* The defendant was eventually apprehended in the field and returned to the patrol car; at this point, the officer searched the fanny pack and discovered within the white bag a bundle of counterfeit $50 bills. *Id.* at 391.

The *Garcia* case is distinguishable from the present case in the following significant ways. In *Garcia*, the defendant was lawfully detained for committing several traffic violations, including leading police officers on a high speed pursuit before pulling over. Defendant in the present case was lawfully in his hotel room when detained and questioned by police officers. The defendant in *Garcia* set his fanny pack down – **zipped open** – and an officer squeezed the contents of the fanny pack and felt what seemed to the officer to be a large quantity of money; the officers then questioned the defendant, who yelled "get your hands off there" and then fled on foot into a nearby field. In the present case, Defendant dropped a blue duffle bag in his hotel room – cinched shut – and Officer Reese did not attempt to feel or palpate the bag in any way to determine its contents, nor did Officer Reese question Defendant about the contents of the bag. Rather, Officer Reese immediately opened the bag after grabbing it from the floor of Defendant's hotel room.

In sum, the undersigned finds that Officer Reese did not have justification to open the blue bag after picking it up. Indeed, the sole justification given by Officer Reese for picking up

and opening the bag is that the bag made a loud "thud" when it hit the ground. Some cases have permitted searches of bags based upon a "thud," however several other factors also militated in favor of a search in these cases. A good example is *United States v. Atlas*, 94 F.3d 447 (8th Cir. 1996). In *Atlas*, officers were summoned to a "retrieve property" call[1] at an address where paramedics had previously been assaulted. *Atlas*, 94 F.3d at 449. Upon arriving on the scene, officers saw the defendant standing on the house's porch; the defendant acted like he was surprised to see police. *Id.* The defendant was holding a nylon duffle bag in his hand; as soon as the defendant saw the officers, he dropped the bag and it made a loud "thud" when it hit the ground. *Id.* The defendant then walked away from the officers, towards one of the doors of the house. *Id.*

At this point, the officer became suspicious that the bag may contain a weapon; this suspicion was based upon three factors: (1) the way the defendant threw the bag down when he saw the officer; (2) the "thud" the bag made when it hit the ground; and (3) the fact that the officer, just one week earlier, recovered a weapon from a nylon bag very similar to the one dropped by the defendant. *Id*. The officer then asked the defendant if the house was the one officers were dispatched to, which the defendant (untruthfully) said "no." *Id.* The officer then asked the defendant what was in the bag, to which the defendant responded "[W]hat bag?" *Id*. The officer then said "[T]he one you just threw down." *Id.* Notwithstanding the thud the officer heard, the defendant then answered "[O]h, oh nothing." *Id.*

---

[1] A retrieve property call involves a party to a past domestic dispute obtaining police oversight of that person's recovery of personal belongings from a dwelling after that person has been excluded, usually pursuant to a domestic arrest. Police oversight is needed to ensure that no further altercation or violation of protective orders takes place.

In *Atlas*, the officer further testified that the defendant appeared "real nervous," and continually shifted his gaze between the bag and the officer, as if the defendant did not want the officer to look at the bag. *Id.* The officer then asked the defendant to place his hands on the wall for a pat down search, and asked the defendant if the bag was his, to which the defendant responded "no." *Id.* As the officer began to pat the defendant down, he instructed a second officer to check the bag. *Id.* The second officer touched the bag, and – without opening the bag – felt what he thought was a shotgun. *Id.* The second officer advised the first officer of his discovery, at which time the defendant began to resist and fight the first officer. *Id.* After the two officers succeeded in subduing and cuffing the defendant, they opened the bag and discovered a loaded, bolt-action rifle with a sawed off barrel. *Id.*

Contrasting *Atlas* with the present case shows that there were numerous other factors in *Atlas* which justified the searching of the defendant's bag. In *Atlas*, the officer testified that he recovered a weapon from a bag very similar to the one throw down by the defendant, just one week earlier. Also, in *Atlas*, the officer questioned the defendant about the bag, and in response the defendant gave very evasive answers. Moreover, in *Atlas*, the second officer **felt the bag before opening the bag** and felt what he thought was a shotgun. After voicing his discovery, the defendant became very combative and started assaulting the officers. None of these additional factors occurred in the present case. Rather, upon seeing Defendant drop the bag and hearing a "thud," Officer Reese immediately picked up and opened the bag. Officer Reese gave no further description of the "thud" (i.e., that it sounded like a hard or metal object, etc) or that it was otherwise consistent with the sound of a dropped bag that contained a weapon.

Finally, the Sixth Circuit case *United States v. Williams*, 962 F.2d 1218 (6th Cir. 1992) also serves as a pertinent contrast to the present case, and demonstrates how the Romulus police officer might have acted differently. In *Williams*, police officers were surveilling a known drug house when they observed a black limousine (with illegally tinted windows) pull out of that house's driveway. *Id.* at 1221. Officers observed two women in the limousine, both of whom were previously reported to police as being active narcotics traffickers. *Id.* at 1222. Based upon this information, and based upon the limo's illegally tinted windows, officers followed the limousine and eventually pulled it over. *Id.* Upon pulling over the limo, officers ordered both women out of the car – one of the women was carrying a large black purse when she got out of the limo. *Id.* Officers then looked into the car and saw grocery bags protruding from under the driver's seat. *Id*. As one of the women had previously been arrested with marijuana in a grocery bag, the officers removed this bag and searched it; they discovered cocaine. *Id.* The officers also located an empty 9 millimeter handgun clip in the limo. *Id.*

At this point, the officers became concerned that the woman with the large black purse might be armed. *Id.* This concern was based upon the fact that: (1) the officers recovered an empty handgun magazine from the limo, but did not locate a weapon that might go with said magazine; and (2) the woman holding the purse was reported to be a known drug trafficker and was previously known to carry a weapon. *Id.* Thus, the officer determined that a search of the woman's purse was warranted. To this end, the officer **asked the woman to open her purse**. *Id.* She refused. *Id.* The officer then **informed the woman that he was just looking for a weapon**, and **asked her if he could feel or squeeze her purse**. *Id*. The woman also refused this request. *Id.* The officer then attempted to touch the woman's purse, and the woman became

-18-

"wild and boisterous" and "obnoxious and belligerent, swearing like crazy." *Id.* At this point, the officer placed the woman under arrest for disorderly conduct; he then opened her purse and discovered cocaine. *Id*.

Contrasting the officer's actions in *Williams* to Officer Reese's actions in the present case shows what Officer Reese could have done differently. In the present case, Officer Reese testified that he picked up Defendant's duffle bag from the floor, and immediately opened it. After securing the bag and ameliorating any purported safety concern, Officer Reese did not: (1) ask Defendant whether he could open the duffle bag; (2) ask Defendant what was in the duffle bag; or (3) feel the duffle bag to attempt to determine if it contained a weapon. Officer Reese should have taken some, or all, of these steps before opening Defendant's duffle bag.

Because the undersigned finds that the search of Defendant's duffle bag was unlawful, any evidence or contraband discovered as a result of that intrusion was illegally obtained. *See United States v. Williams*, 604 F.2d 1102, 1123 (8th Cir. 1979). Therefore, all the evidence recovered from Defendant's blue duffle bag, from Defendant's person after he was arrested and from Defendant's hotel room should be suppressed.

## IV. CONCLUSION

For the reasons discussed above, the undersigned recommends that Defendant Brandon Henry Davis-Devine's motion to suppress (Dkt. 12) be **GRANTED**.

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140

(1985); *Howard v. Secretary of HHS*, 932 F.2d 505, 508 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947, 949-50 (6th Cir. 1981). The filing of objections which raise some issues, but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation. *Willis v. Secretary of HHS*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

Within fourteen (14) days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall be no more than 20 pages in length unless, by motion and order, the page limit is extended by the court. The response shall address each issue contained within the objections specifically and in the same order raised.

                                            s/Mark A. Randon
                                            MARK A. RANDON
                                            UNITED STATES MAGISTRATE JUDGE

Dated: April 21, 2010

### Certificate of Service

*I hereby certify that a copy of the foregoing document was served on the parties of record on this date, April 21, 2010, by electronic and/or first class U.S. mail.*

                                            *s/Melody R. Miles*
                                            *Case Manager to Magistrate Judge Mark A. Randon*
                                            *(313) 234-5542*